SKINNER, SECRETARY OF TRANSPORTATION *v.*
MID-AMERICA PIPELINE CO.

No. 87–2098.   Argued March 1, 1989—Decided April 25, 1989

O'CONNOR, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Merrill* argued the cause for appellant. With him on the briefs were former *Solicitor General Fried, Acting Assistant Solicitor General Bryson,*

*Assistant Attorney General Bolton, Brian J. Martin,* and *Bruce G. Forrest.*

*Richard McMillan, Jr.,* argued the cause for appellee. With him on the brief were *Clifton S. Elgarten, Luther Zeigler,* and *Kristen E. Cook.* *

JUSTICE O'CONNOR delivered the opinion of the Court.

We decide today whether § 7005 of the Consolidated Omnibus Budget Reconciliation Act of 1985, which directs the Secretary of Transportation to establish a system of user fees to cover the costs of administering certain federal pipeline safety programs, is an unconstitutional delegation of the taxing power by Congress to the Executive Branch. We hold that it is not.

## I

## A

In 1986, Congress enacted the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Pub. L. 99–272, 100 Stat. 82. Section 7005 of COBRA, codified at 49 U. S. C. App. § 1682a (1982 ed., Supp. IV), and entitled "Pipeline safety user fees," directs the Secretary of Transportation (Secretary) to "establish a schedule of fees based on the usage, in reasonable relationship to volume-miles, miles, revenues, or an appropriate combination thereof, of natural gas and hazardous liquid pipelines." § 7005(a)(1). These fees are to be collected annually, § 7005(b), from "persons operating—(A) all pipeline facilities subject to the Hazardous Liquid Pipeline Safety Act of 1979 (49 U. S. C. App. 2001 et seq.); and (B) all pipeline transmission facilities and all liqui-

---

*Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States et al. by *Richard M. Smith, Robin S. Conrad, John H. Cheatham III, Linda G. Stuntz, Steven G. McKinney,* and *Richard D. Avil, Jr.;* for Florida Power & Light Co. et al. by *Jay E. Silberg, Joseph B. Knotts, Jr., Scott M. DuBoff, Harold F. Reis,* and *Michael F. Healy;* and for the National Taxpayers Union et al. by *Gale A. Norton.*

fied natural gas facilities subject to the jurisdiction of the Natural Gas Pipeline Safety Act of 1968 (49 U. S. C. App. 1671 et seq.)." § 7005(a)(3). The Hazardous Liquid Pipeline Safety Act (HLPSA) regulates interstate and intrastate pipelines carrying petroleum, petroleum products, or anhydrous ammonia. See 49 CFR pt. 195 (1987). The Natural Gas Pipeline Safety Act of 1968 (NGPSA), in turn, regulates certain liquified natural gas (LNG) facilities, see 49 CFR pt. 193 (1987), as well as interstate and intrastate pipelines carrying natural gas, flammable gas, or gas that is toxic or corrosive, see 49 CFR pts. 191, 192 (1987).

The fees collected under § 7005 of COBRA are to be used "to the extent provided for in advance in appropriation Acts, only—

"(1) in the case of natural gas pipeline safety fees, for activities authorized under the Natural Gas Pipeline Safety Act of 1968 . . . ; and

"(2) in the case of hazardous liquid pipeline safety fees, for activities authorized under the Hazardous Liquid Pipeline Safety Act of 1979 . . . ." § 7005(c).

These "activities" include Department of Transportation expenses incurred in administering the Pipeline Safety Acts, such as salaries, travel, printing, communication, and supplies, as well as "regulatory, enforcement, training and research costs, and State grants-in-aid." 51 Fed. Reg. 25783 (1986). The fees assessed and collected are to be "sufficient to meet the costs of [these] activities . . . but at no time shall the aggregate of fees received for any fiscal year . . . exceed 105 percent of the aggregate of appropriations made for such fiscal year for activities to be funded by such fees." § 7005(d). Section 7005 of COBRA is one of a number of recent congressional enactments designed to make various federal regulatory programs partially or entirely self-financing. E. g., § 3401 of the Omnibus Budget Reconciliation Act of 1986, 100 Stat. 1890, codified at 42 U. S. C. § 7178 (1982 ed., Supp. IV) (entire regulatory budget of the Federal Energy

Regulatory Commission); COBRA § 7601, codified at 42 U. S. C. § 2213 (1982 ed., Supp. IV) (33 percent of regulatory budget of the Nuclear Regulatory Commission; 45 percent in fiscal years 1988 and 1989).

Pursuant to the mandate of § 7005, the Secretary published fee schedules for fiscal year (FY) 1986 on July 16, 1986. 51 Fed. Reg. 25782 (1986). Prior to publication, the Secretary consulted the pipeline industry's major trade associations for assistance in determining the appropriate basis for assessing fees within the range of options permitted by § 7005(a)(1). The consensus of these trade associations — the American Petroleum Institute, the American Gas Association, the Interstate Natural Gas Association of America, and the Association of Oil Pipe Lines — was that pipeline mileage (referred to simply as "miles" in § 7005) would provide "the most reasonable basis for determining fees . . . ." 51 Fed. Reg. 25782 (1986). The Secretary agreed with this consensus for purposes of the FY 1986 fee schedules. In comments submitted to the Secretary for consideration of possible changes to be made in the fee schedules for FY 1987, about one-third of those commenting objected to pipeline mileage as the basis for assessing fees, arguing that volume-miles would provide a more accurate indicator of the term "usage" in § 7005 and that mileage alone did not fairly reflect the Department of Transportation's enforcement expenditures. The Secretary decided to continue assessing § 7005 fees based on mileage because of the ease of administering such a system and because "long pipelines of small diameter require just as much if not more enforcement effort than shorter pipelines of large diameter." Id., at 46978.

The Secretary also determined that the total pipeline safety program costs, excluding State grants-in-aid, should be allocated at 80 percent for persons regulated by the NGPSA and 20 percent for persons regulated by the HLPSA. The costs of grants were to be allocated at 95 percent for persons regulated by the NGPSA and 5 percent for

persons regulated by the HLPSA. Five percent of the total gas program costs were to be borne by LNG facility operators allocated as a function of storage capacity and number of LNG plants. *Id.*, at 25783, 46976. Finally, the Secretary estimated that the administrative costs of assessing fees on the 23 percent of the Nation's gas operators with less than 10 miles of gas pipeline and the 17 percent of the Nation's hazardous liquid operators with less than 30 miles of hazardous liquid pipeline would exceed the value of the fees assessed. Accordingly, the Secretary exempted these small mileage operators from assessment of § 7005 fees. *Ibid.*

On the basis of this fee schedule framework, the Secretary set fees of $23.99 per mile for gas pipelines and $6.41 per mile for hazardous liquid pipelines in FY 1986. Operators of LNG facilities were assessed lump sums ranging from $1,250 to $7,500 per plant. *Id.*, at 25783. The total costs for both pipeline safety programs were $7.773 million, $8.523 million, and $8.550 million for FY's 1986, 1987, and 1988 respectively. Brief for Appellant 4, n. 2. Expenses for FY 1989 are estimated at $9.3 million. See Department of Transportation and Related Agencies Appropriations Act, 1989, Pub. L. 100–457, 102 Stat. 2143–2144.

## B

Appellee Mid-America Pipeline Company, based in Tulsa, Oklahoma, owns and operates pipelines that transport hazardous liquids and is, therefore, subject to the regulatory strictures of the HLPSA. On July 28, 1986, pursuant to its recently published fee schedule, the Secretary assessed Mid-America $53,023.52 as its share of the cost of federal administration of the HLPSA. Mid-America paid that sum under protest and filed suit against the Secretary in the United States District Court for the Northern District of Oklahoma seeking declaratory and injunctive relief. On cross-motions for summary judgment, the United States Magistrate assigned to the case recommended that § 7005 of COBRA be

struck down as an unconstitutional delegation to the Department of Transportation of Congress' taxing power. Relying primarily on our decisions in *National Cable Television Assn., Inc.* v. *United States*, 415 U. S. 336 (1974), and *FPC* v. *New England Power Co.*, 415 U. S. 345 (1974), the Magistrate concluded that the assessments made under § 7005 are taxes rather than fees. The Magistrate then determined in light of *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394 (1928), and *American Power & Light Co.* v. *SEC*, 329 U. S. 90 (1946), that, in enacting § 7005, Congress did not give the kind of guidance to the Secretary necessary to avoid the conclusion that Congress had unconstitutionally delegated its taxing power to the Executive Branch.

The District Court adopted these conclusions and entered judgment for Mid-America on February 9, 1988. Invoking this Court's appellate jurisdiction under 28 U. S. C. § 1252, the Secretary appealed the decision of the District Court directly to this Court and we noted probable jurisdiction. *Sub nom. Burnley* v. *Mid-America Pipeline Co.*, 488 U. S. 814 (1988). Because the District Court entered its judgment before September 25, 1988, the repeal of 28 U. S. C. § 1252 by Public Law 100–352, §1, 102 Stat. 662, does not affect our jurisdiction in this case. Appeals from district court judgments finding Acts of Congress unconstitutional and entered after the repealer's effective date, however, must now be taken to the appropriate federal court of appeals, pursuant to 28 U. S. C. § 1291.

## II

Earlier this Term, in *Mistretta* v. *United States*, 488 U. S. 361 (1989), we revisited the nondelegation doctrine and reaffirmed our longstanding principle that so long as Congress provides an administrative agency with standards guiding its actions such that a court could "'ascertain whether the will of Congress has been obeyed,'" no delegation of legislative authority trenching on the principle of separation of powers has occurred. *Id.*, at 379, quoting *Yakus* v. *United States*, 321

U. S. 414, 426 (1944). See *American Power & Light Co.* v. *SEC, supra,* at 105 (It is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. Private rights are protected by access to the courts to test the application of the policy in the light of these legislative declarations").

Appellee Mid-America does not seriously contend that the guidelines provided by Congress to the Secretary in § 7005 do not meet the normal requirements of the nondelegation doctrine as we have applied it. Nor could Mid-America support any such contention. In enacting § 7005, Congress delimited the scope of the Secretary's discretion with much greater specificity than in delegations that we have upheld in the past. Cf. *Lichter* v. *United States,* 334 U. S. 742, 778–786 (1948) (upholding delegation of authority to War Department to recover "excessive profits" earned on military contracts); *Yakus, supra,* at 420, 426–427 (upholding delegation of authority to the Price Administrator to fix prices of commodities that "will be generally fair and equitable and will effectuate the purposes" of the congressional enactment); *FPC* v. *Hope Natural Gas Co.,* 320 U. S. 591, 600–601 (1944) (upholding delegation to Federal Power Commission to determine just and reasonable rates); *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 194, 225–226 (1943) (upholding delegation to the Federal Communications Commission to regulate broadcast licensing as "public interest, convenience, or necessity" require).

Under § 7005, the Secretary may not collect fees from firms not subject to either of the two Pipeline Safety Acts, § 7005(a)(3); he may not use the funds for purposes other than administering the two Acts, § 7005(c); he may not set fees on a case-by-case basis, § 7005(a); in setting fees, he may not apply any criteria other than volume-miles, miles, or revenues, § 7005(a); he may not establish a fee schedule that does not bear a "reasonable relationship" to these criteria,

§ 7005(a). Furthermore, the Secretary has no discretion whatsoever to expand the budget for administering the Pipeline Safety Acts because the ceiling on aggregate fees that may be collected in any fiscal year is set at 105 percent of the aggregate appropriations made by Congress for that fiscal year. § 7005(d). We have no doubt that these multiple restrictions Congress has placed on the Secretary's discretion to assess pipeline safety user fees satisfy the constitutional requirements of the nondelegation doctrine as we have previously articulated them.

Mid-America contends—and the District Court agreed—that, notwithstanding the constitutional soundness of § 7005 under ordinary nondelegation analysis, the assessment of these pipeline safety user fees must be scrutinized under a more exacting nondelegation lens. When so scrutinized, Mid-America argues, § 7005 is revealed to be constitutionally inadequate. In Mid-America's view, the assessments permitted by § 7005, although labeled "user fees," are actually tax assessments levied by the Secretary on firms regulated by the HLPSA or the NGPSA. Congress' taxing power, Mid-America further contends, unlike any of Congress' other enumerated powers, if delegable at all, must be delegated with much stricter guidelines than is required for other congressional delegations of authority. Mid-America purports to derive this two-tiered theory of nondelegation from the text and history of the Constitution, from past congressional practice, and from the decisions of this Court.

Article I, § 8, of the Constitution enumerates the powers of Congress. First in place among these enumerated powers is the "Power To lay and collect Taxes, Duties, Imposts and Excises . . . ." We discern nothing in this placement of the Taxing Clause that would distinguish Congress' power to tax from its other enumerated powers—such as its commerce powers, its power to "raise and support Armies," its power to borrow money, or its power to "make Rules for the Government"—in terms of the scope and degree of discretionary au-

thority that Congress may delegate to the Executive in order that the President may "take Care that the Laws be faithfully executed." Art. II, §3. See *J. W. Hampton, Jr., & Co.*, 276 U. S. 394 (1928) (upholding broad delegation of authority to the President under the Taxing Clause and the Commerce Clause to impose duties on foreign imports). It is, of course, true that "[a]ll Bills for raising Revenue [must] originate in the House of Representatives . . . ." Art. I, §7. But the Origination Clause, while embodying the Framers' concern that persons elected directly by the people have initial responsibility over taxation (until the ratification of the Seventeenth Amendment in 1913, Senators were chosen by state legislatures, see Art. I, §3), implies nothing about the scope of Congress' power to delegate discretionary authority under its taxing power once a tax bill has been properly enacted. Mid-America does not contend that § 7005 failed to originate in the House. The House Committee on Energy and Commerce drafted the provision, which was included in H. R. 3500, 99th Cong., 1st Sess. See H. R. Rep. No. 99–300, p. 492 (1985).

From its earliest days to the present, Congress, when enacting tax legislation, has varied the degree of specificity and the consequent degree of discretionary authority delegated to the Executive in such enactments. See, *e. g.*, Act of Mar. 3, 1791, ch. 15, § 43, 1 Stat. 209 (in the case of fines assessed for nonpayment of liquor taxes, "the secretary of the treasury of the United States [has] . . . power to mitigate or remit such penalty or forfeiture . . . upon such terms and conditions as shall appear to him reasonable") (First Congress); Act of July 6, 1797, ch. 11, §2, 1 Stat. 528 (in lieu of collecting stamp duty enacted by Congress, the Secretary of the Treasury may "agree to an annual composition for the amount of such stamp duty, with any of the said banks, of one per centum on the amount of the annual dividend made by such banks") (Fifth Congress). See generally *Field* v. *Clark*, 143 U. S. 649, 683–689 (1892) (longstanding practice of Congress

delegating authority to the President under the Taxing Clause "is entitled to great weight").

Even when Congress legislates with remarkable specificity, as it has done in the Internal Revenue Code, it has delegated to the Executive the authority to "prescribe all needful rules and regulations for the enforcement of [the Code], including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue" and the authority to determine "the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect." 26 U. S. C. §§ 7805(a), (b). Such rules and regulations, which undoubtedly affect individual taxpayer liability, are equally without doubt the result of entirely appropriate delegations of discretionary authority by Congress. As we observed in *Bob Jones University* v. *United States*, 461 U. S. 574 (1983):

> "In an area as complex as the tax system, the agency Congress vests with administrative responsibility must be able to exercise its authority to meet changing conditions and new problems. . . .
>
> "Congress, the source of IRS authority, can modify IRS rulings it considers improper; and courts exercise review over IRS actions. In the first instance, however, the responsibility for construing the [Internal Revenue] Code falls to the IRS. Since Congress cannot be expected to anticipate every conceivable problem that can arise or to carry out day-to-day oversight, it relies on the administrators and on the courts to implement the legislative will." *Id.*, at 596–597.

See also *National Muffler Dealers Assn., Inc.* v. *United States*, 440 U. S. 472, 488 (1979) ("The choice among reasonable interpretations [of the Internal Revenue Code] is for the Commissioner, not the courts").

We find no support, then, for Mid-America's contention that the text of the Constitution or the practices of Congress require the application of a different and stricter non-

delegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power. In light of this conclusion, we need not concern ourselves with the threshold question that so exercised the District Court whether the pipeline safety users "fees" created by § 7005 are more properly thought of as a form of taxation because some of the administrative costs paid by the regulated parties actually inure to the benefit of the public rather than directly to the benefit of those parties. Even if the user fees are a form of taxation, we hold that the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that we have applied to other nondelegation challenges. Congress may wisely choose to be more circumspect in delegating authority under the Taxing Clause than under other of its enumerated powers, but this is not a heightened degree of prudence required by the Constitution.

Our decisions in *National Cable Television Assn., Inc.* v. *United States*, 415 U. S. 336 (1974), and *FPC* v. *New England Power Co.*, 415 U. S. 345 (1974), are not to the contrary. In these cases we considered the provision of the Independent Offices Appropriation Act (IOAA), 1952, 65 Stat. 290, recodified at 31 U. S. C. § 9701, that allows agencies to collect fees based on "(A) the costs to the Government; (B) the value of the service or thing to the recipient; (C) public policy or interest served; and (D) other relevant facts." 31 U. S. C. § 9701(b)(2). The Federal Communications Commission and the Federal Power Commission respectively sought to recoup all of their costs in regulating community antenna television systems and in administering the Federal Power Act and the Natural Gas Act by assessing fees on the regulated parties. Recognizing that some of the administrative costs at issue "inured to the benefit of the public," 415 U. S., at 343, rather than directly to the regulated parties, we expressed doubt whether Congress had clearly intended in the IOAA to delegate authority to Executive agencies to recover the costs of

benefits conferred on the public by assessing fees on regulated parties. We observed that, because such fees do not "besto[w] a benefit on the [regulated party], not shared by other members of society," they might better be thought of as taxes rather than fees. Given at least the possibility of a constitutional difficulty arising from that delegation under the Taxing Clause, we chose to interpret the IOAA "narrowly to avoid constitutional problems." *Id.*, at 342. Accordingly, we struck down the agencies' efforts to recover from regulated parties costs for benefits inuring to the public generally.

In *FEA* v. *Algonquin SNG, Inc.*, 426 U. S. 548 (1976), we considered a nondelegation challenge to the Trade Expansion Act of 1962, 76 Stat. 872, which permitted the President to raise license "fees" on imports when necessary to protect the national security. In rejecting the challenge, we made clear that *National Cable Television* and *New England Power* stand only for the proposition that Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens, whether characterized as "fees" or "taxes," on those parties. 426 U. S., at 560, n. 10. Of course, any such delegation must also meet the normal requirements of the nondelegation doctrine. As we have indicated, § 7005 explicitly reflects Congress' intention that the total costs of administering the HLPSA and the NGPSA be recovered through the assessment of charges on those regulated by the Acts and provides intelligible guidelines for these assessments. Finding no unconstitutional delegation of authority, we reverse the decision of the District Court.

*It is so ordered.*