# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 15, 2011          Decided July 13, 2012

No. 11-1094

RURAL CELLULAR ASSOCIATION AND UNIVERSAL SERVICE
FOR AMERICA COALITION,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER
ADVOCATES AND VERIZON,
INTERVENORS

On Petition for Review of an Order of
the Federal Communications Commission

*Todd D. Daubert* argued the cause for petitioners. With him on the briefs were *Jennifer A. Morrissey*, *J. Isaac Himowitz*, *Richard P. Bress*, *Matthew A. Brill*, and *Katherine I. Twomey*.

*Maureen K. Flood*, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the briefs were *Robert B. Nicholson* and *Kristen C. Limarzi*, Attorneys, U.S. Department of Justice, *Austin C. Schlick*,

General Counsel, Federal Communications Commission, *Peter Karanjia*, Deputy General Counsel, *Richard K. Welch*, Deputy Associate General Counsel, and *James M. Carr*, Counsel.

Before: TATEL and GARLAND, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: The Rural Cellular Association and the Universal Service for America Coalition (together the RCA) petition for review of an Order of the Federal Communications Commission amending the "interim cap rule," which limits at 2008 levels the amount of support available to competitive eligible telecommunications carriers (CETCs) through the High-Cost Universal Service Support Program. In the order under review, the Commission amended the interim cap rule to provide that when a carrier relinquishes its status as an eligible communications carrier, the cap on the support available in that carrier's state is reduced by the amount the relinquishing carrier would have received had it retained its status. The RCA argues the Order violates the Communications Act of 1934 as amended by the Telecommunications Act of 1996 (together the Act), violates the Commission's regulations, and is arbitrary and capricious for failure to explain how it ensures the "sufficient" level of support for CETCs required by the Act. For the reasons set out in Part II, we deny the petition for review.

## I. Background

Prior to the passage of the Telecommunications Act of 1996, the Commission used implicit subsidies to implement

the mandate in the Communications Act of 1934 to "make available, so far as possible ... a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges," 47 U.S.C. § 151. The Commission and state telephone regulators effected an implicit cross-subsidy by setting rates in rural areas below cost and setting rates in urban areas above cost. This system was unsustainable, however, in the competitive environment ushered in by the Telecommunications Act of 1996. The Congress therefore directed the Commission to replace the system of implicit subsidies with explicit ones, euphemistically referred to as "specific, predictable, and sufficient ... mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b)(5). The Commission established several such "mechanisms," including the High-Cost Program at issue in this case. 47 C.F.R. § 54.101.

In order to fund the new explicit subsidies, the Congress required "every telecommunications carrier that provides interstate telecommunication services" to "contribute, on an equitable and nondiscriminatory basis" to those mechanisms. 47 U.S.C. § 254(d). The Commission has promulgated a series of regulations to implement this statutory mandate.

First, in order to calculate the costs of the High-Cost Program, the regulations require the Universal Service Administration Company (USAC), which runs the Program, to submit each quarter "its projections of demand for the federal universal support mechanisms" and "its projections of administrative expenses." 47 C.F.R. § 54.709(a)(3). The Commission may approve or, within 14 days, may set aside the USAC's projections and "set projections of demand and administrative expenses at amounts that the Commission determines will serve the public interest." *Id.*

Second, in order to determine the aggregate amount to be collected from all telecommunications carriers, the regulations require the USAC to "calculate the quarterly contribution factor" based upon "the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected end-user interstate and international telecommunications revenues." *Id*. § 54.709(a)(2). Each telecommunications carrier's quarterly assessment is then determined by applying this contribution factor to that carrier's end-user revenue. Should contributions for a particular quarter exceed the disbursements plus the USAC's administrative costs for that quarter, the "excess payments will be carried forward," thereby reducing the contribution factor for the subsequent quarter. *Id.* § 54.709(b).

Section 254(e) of the Act provides universal service support may be disbursed only to an "eligible telecommunications carrier." 47 U.S.C. § 254(e). Both an incumbent local exchange carrier (ILEC) and a new market entrant may receive universal service support upon being designated an ETC by the Commission or by a state regulator. The amount of support going to an ILEC is indexed to a portion of its total costs of serving the relevant area. 47 C.F.R. § 54.301. The amount of support available to a CETC, before the changes at issue in this case, was calculated according to the "identical support rule": The per-line costs of the ILEC in the area were multiplied by the number of lines the CETC had in service. 47 C.F.R. § 54.307(a)(1).

The Commission adopted the identical support rule for ease of administration, *Fed.-State Joint Bd. on Universal Serv.*, 17 FCC Rcd. 22,642, ¶ 7 (2002), but the result was an explosive growth in universal support disbursements to CETCs through the High-Cost Program. Total disbursements

through the Program increased to $4.3 billion in 2007 from $2.6 billion in 2001, while disbursements to CETCs alone increased to $1.18 billion from a mere $17 million.

Several factors contributed to this dramatic increase. First, to the extent consumers kept their wireline service provided by the ILEC when they purchased wireless service from a CETC, the increase in support to the CETC was not offset by a decrease in support to the ILEC. Second, although many consumers did give up their wireline service, a decrease in the number of lines serviced by an ILEC does not decrease the ILEC's cost proportionally because the provision of wireline services involves very large fixed and relatively small variable per-line costs; hence, the ILEC's cost-per-line increases as it loses customers. Under the identical support rule, this increased the support-per-line for a CETC even as the number of lines it had in service increased and its costs per-line went down. Third, because the identical support rule provided support to CETCs on the basis of the number of lines they had in service, regardless of the cost of providing those lines, the rule amplified a CETC's incentive to increase the number of its lines in areas it could serve at the least cost rather than to expand service into the more costly and therefore more needful areas.

In May 2008 the Commission adopted an "interim, emergency cap" on universal service support payments to CETCs through the High-Cost Program. *High Cost Universal Support*, 23 FCC Rcd. 8834, 8834 (2008) (hereinafter the *Interim Cap Order*). The *Interim Cap Order* limited "total annual [CETC] support for each state ... [to] the level of support that [CETCs] ... were eligible to receive during March 2008 on an annualized basis." *Id*. The Commission directed the USAC to "calculate the support each [CETC] would have received under the existing (uncapped) per-line identical

support rule," and then to decrease this support by a "state reduction factor" equal to the ratio of the state's capped support to the state's uncapped support. *Id.* at 8846. The *Interim Cap Order* thus reduced by a fixed percentage the universal service support received by each CETC in any given state. In order to ensure the interim cap rule satisfied the statutory direction that support be "sufficient ... to preserve and advance universal service", the Commission allowed a CETC to receive up to the full amount it would have received under the uncapped identical support rule if it submitted "cost data demonstrating that its costs meet the support threshold in the same manner as the [ILEC]." *Id.* at 8848.

The RCA filed a petition for review of the *Interim Cap Order*, which this court denied in *Rural Cellular Association v. FCC*, 588 F.3d 1095, 1100 (D.C. Cir. 2009) (*Rural Cellular I*). As relevant here, we rejected the RCA's argument the Commission unreasonably interpreted its statutory mandate to provide "sufficient" universal service support by limiting disbursements in order to protect the long-term sustainability of the Program. *Id.* at 1102. The court also rejected the RCA's argument the Commission misinterpreted the Act as requiring "sufficient, but not excessive" support, which according to the petitioners would "elevate[] the Commission's own goal of preserving the solvency of the [Program] over Congress's directive in [47 U.S.C.] § 254(b)(5) that the fund provide support that is 'sufficient' to meet the needs of preserving and advancing universal service." *Id.* The court noted the safety valve in the *Interim Cap Order* undermined the RCA's claim the level of support would not be sufficient; a CETC for which the capped amount would be insufficient had only to submit cost data to receive greater support. *Id.* at 1104.

In September 2010, the Commission clarified how the *Interim Cap Order* applies to universal service support in a particular state when a carrier voluntarily surrenders the subsidy to which it was entitled as an ETC. *High-Cost Universal Service Support*, 25 FCC Rcd. 12,854 (2010) (hereinafter the *Corr Wireless Order*). In 2008 Verizon Wireless and Sprint Nextel, both CETCs, had each agreed to surrender universal service support in order to get the Commission's approval to merge with another carrier. Because this appeared to free up money within the limits imposed by the *Interim Cap Order*, Corr Wireless, another CETC, requested "any support reclaimed from Verizon Wireless and Sprint Nextel be redistributed to other" CETCs. *Id.* at 12,854. The Commission "agree[d] ... that [the] USAC cannot modify the interim cap amount by removing Verizon Wireless's and Sprint Nextel's support, but ... disagree[d] that all support surrendered ... must necessarily be distributed to other [CETCs]." *Id.* at 12,857. The Commission reasoned "as long as Verizon Wireless and Sprint Nextel remain eligible for a given level of support — regardless of whether they actually receive that support — that support will be included [in calculating the] interim cap," *id.* at 12,858, and therefore in the contribution required of each carrier in the relevant state. Although the Commission concluded the cap amount would remain the same, it "decline[d] to redistribute the reclaimed high-cost support," *id.*, instead "direct[ing] [the] USAC to reserve any reclaimed funds as a fiscally responsible down payment on proposed broadband universal service reforms," *id.* at 12,862, here referring to FEDERAL COMMUNICATIONS COMMISSION, CONNECTING AMERICA: THE NATIONAL BROADBAND PLAN (March 16, 2010), *available at* http://download.broadband.gov/plan/national-broadband-plan.pdf.

To ensure the USAC "reserved" these funds, the Commission "instruct[ed] [it] to continue projecting that [CETC] support will be disbursed at the interim cap amount." *Corr Wireless Order*, 25 FCC Rcd. at 12,862. The Commission also temporarily waived the requirement that the "USAC account for any difference between its projected revenue requirements and its actual revenue requirements as a prior period adjustment in the next quarterly demand filing." *Id.* The USAC therefore continued to assess carriers as if high-cost support were being disbursed at the full amount of the interim cap, and it was not required to reduce the next quarter's contribution factor although actual disbursements were less than the interim cap amount due to Verizon and Sprint having surrendered their rights to receive support. As a result of these two actions, contributions to the USAC exceeded its disbursements and the surplus created a "temporary reserve."

The *Corr Wireless Order* addressed only situations in which a CETC surrenders high-cost support to which it is entitled but retains its designation as an ETC. 25 FCC Rcd. at 12,859. When it issued the *Corr Wireless Order*, therefore, the Commission proposed "amending the interim cap rule so that, if a [CETC] relinquishes its ETC status in a state, the cap amount for that state is reduced by the amount of support that the [relinquishing CETC] was eligible to receive." *Id.* at 12,863.

The Universal Service for America Coalition, one of the petitioners in this case, and SouthernLINC Wireless petitioned the Commission to reconsider the *Corr Wireless Order* insofar as it declined to redistribute the funds reclaimed from Verizon and Sprint, arguing the agency lacks statutory authority "to establish a pool of funds to be used for unspecified purposes at an undetermined point in the future"

and "the Act ... could not authorize the Commission to do so without itself violating the Origination and Taxing Clauses of the United States Constitution." The Commission has not yet acted upon that petition for reconsideration, nor has any party sought judicial review of the underlying *Corr Wireless Order*.

In the *Order* under review, the Commission adopted the proposal it had made when it issued the *Corr Wireless Order*, thereby amending its rules so as "to reclaim high-cost universal service support surrendered by a [CETC] when it relinquishes ETC status." *High-Cost Universal Service Support*, 25 FCC Rcd. 18,146, 18,146 (2010) (hereinafter *Relinquishing ETC Status* or the *Order*). Acknowledging the goal of the *Interim Cap Order* was to "rein in high-cost universal service disbursements for potentially duplicative voice services," *id.* at 18,147, the Commission reasoned: "Providing the excess support to other [CETCs] in a state would not necessarily result in future deployment of expanded voice service, much less broadband service," *id.* at 18,148. It further found the "excess funds from the legacy high-cost program [could] be used more effectively to advance universal service broadband initiatives, as recommended by the National Broadband Plan," *id.*, which aims to expand broadband access to the Internet throughout the United States. The Commission also directed the USAC to "continue to project [CETC] demand at the full amount of the cap as established by the *Interim Cap Order*, without reflecting any adjustments to the cap due to relinquishment or revocation of ETC status by a [CETC]," *id.* at 18,148 n.15, and therefore to continue to collect contributions as if the interim cap had not been reduced. The RCA petitioned this court for review of *Relinquishing ETC Status*.[*]

---

[*] Both before and since issuing the *Order*, the Commission has taken several steps to reform the universal service fund. It has

## II. Analysis

The RCA challenges *Relinquishing ETC Status* on two grounds. First, the RCA argues the *Order*, in "reserving" the reclaimed funds for future use, violates the Act and the Commission's own regulations. Second, the RCA argues the *Order* violates the Administrative Procedure Act because the Commission failed to provide a reasoned explanation of how reducing the level of aggregate support is consistent with the Act's requirement that support for universal service be "sufficient."

### A. Authority for the *Order*

Before we consider the RCA's challenge to the Commission's authority to issue *Relinquishing ETC Status*, we must address the Commission's challenge to our jurisdiction.

#### 1. Jurisdiction

As an initial matter, the Commission contends this court lacks jurisdiction to consider the RCA's argument that "reserving" funds for future use violates the Act and the

---

proposed changes to the rural health care program; raised the cap on schools' and libraries' use of funds reclaimed from the High-Cost Program; proposed creating a fund to improve mobile voice and Internet coverage in underserved areas; and proposed reforms to refocus the High-Cost Program on achieving universal broadband access to the Internet. Most significant, on November 18, 2011 the Commission issued the *Connect America Order*, which comprehensively reforms the agency's approach to universal service by ensuring universal access to fixed and mobile broadband Internet service. *Connect America Order*, 26 FCC Rcd. 17,663 (2011).

Commission's rules because the RCA has "challenged the wrong order." According to the Commission, it was solely the *Corr Wireless Order*, and not *Relinquishing ETC Status*, by which it established the "temporary pool" of funds.[*] *Relinquishing ETC Status*, the Commission claims, "took no further action with respect to the temporary reserve" beyond what the agency had already done in the *Corr Wireless Order*, and so there is no final agency action relevant to the reserve fund for this court to review.

In *Corr Wireless*, 25 FCC Rcd. at 12,862, the Commission waived Rule 54.709(b), which had required the USAC to "carr[y] forward" any "excess payments" to the "following quarter," 47 C.F.R. § 54.709(b). By so doing, the Commission allowed the USAC each quarter to collect more in contributions than it disbursed in subsidies. The Commission concedes the *Order* under review "directed [the] USAC to collect universal service contributions as if any amounts relinquished by [CETCs] were still being distributed" but argues "it is the *holding* of those funds – permitted by the prior waiver of rule 54.709(b) in the *Corr Wireless Order* – not the continued *collection* of those funds, that created the temporary reserve" to which the RCA objects.

The Commission errs in suggesting the waiver of rule 54.709(b) in the *Corr Wireless Order* was the only agency action necessary to create the "temporary reserve." Because the USAC was no longer required to dispose of excess funds by lowering the contribution factor for the next quarter, the

---

[*] The Commission has not yet acted upon the petition for reconsideration of the *Corr Wireless Order*. "Because [that] petition ... is currently pending before the agency, [an] appeal from and petition for review in this court of the [the *Corr Wireless Order*] ... [would be] incurably premature." *BellSouth Corp. v. FCC*, 17 F.3d 1487, 1490 (D.C. Cir. 1994).

waiver of rule 54.709(b) did, of course, staunch the outflow of funds. What kept the inflow of funds above actual expenses each quarter, however, was the Commission's directive to the USAC – in the *Order* under review – to continue collecting contributions "as if" the cap had not been lowered. Each of these actions was necessary to create the "temporary reserve" by setting the level of contributions to the Program higher than the level of disbursements by the Program. Accordingly, the Commission's decision to continue collecting contributions "as if" ETCs had not relinquished their status is a final agency action and the RCA's challenge to that action is therefore properly before the court.

2. Merits

Turning to the merits of the RCA's challenge to the Commission's statutory authority to require quarterly contributions to the Program each quarter at a level higher than the disbursements from the Program projected for that quarter, we note first the agency's interpretation of the Communications Act is entitled to our deference. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984). More specifically, we have previously held the relevant text of section 254 is "vague" and "general" and therefore the Commission's interpretation of that section is properly analyzed under *Chevron* step two, *Rural Cellular I*, 588 F.3d at 1101–02: If that interpretation is reasonable, we must accept it. But wait!

The RCA argues that if the Act were interpreted to authorize the "temporary reserve," then it would be unconstitutional. Because the "canon of constitutional avoidance trumps *Chevron* deference," *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008), we will not accept the Commission's interpretation of an ambiguous

statutory phrase if that interpretation raises a serious constitutional difficulty. Therefore, we turn to the constitutional issues first rather than last, as we would ordinarily do.

a. Constitutional Arguments

The RCA argues first that, because the Act was initially introduced in the Senate, as interpreted by the Commission it would violate the requirement in the Origination Clause that "[a]ll Bills for raising Revenue shall originate in the House of Representatives," U.S. CONST. art. I., § 7, cl. 1. Second, it argues as interpreted by the Commission the Act would be an unconstitutional delegation of the Congress's authority to "lay and collect Taxes," U.S. CONST. art. I., § 8, cl. 1.

We do not agree with the RCA's contention the Act, as the Commission interprets it, is being used to "rais[e] Revenue" within the meaning of the Origination Clause. The Supreme Court has explained "revenue bills are those that levy taxes, in the strict sense of the word, and are not bills for other purposes which may incidentally create revenue." *Twin City Nat'l Bank of New Brighton v. Nebeker*, 167 U.S. 196, 202 (1897). Accordingly, "a statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support the Government generally, is not a 'Bil[l] for raising Revenue.'" *United States v. Munoz-Flores*, 495 U.S. 385, 398 (1990). The Communications Act, as interpreted by the Commission in *Relinquishing ETC Status*, clearly funds only the High-Cost Universal Service Support Program and not the Government generally. The RCA argues that, so interpreted, the Act still "rais[es] Revenue" because it requires "no connection between the payors – providers of interstate telecommunications – and the future beneficiaries of the

[temporary reserve]" but, as the Fifth Circuit has explained, all telecommunications carriers, not just telephone subscribers, benefit from the expansion of universal service. *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 427–28 (1999) (*TOPUC*). That case concerned universal service support for telephone service rather than broadband access, but the same logic applies here. As the Commission explains, because the CETCs, including petitioners, themselves provide Internet access over subscribers' telephone lines, they will benefit from the increased utility of the Internet that comes with a greater number of users having enhanced access to broadband. Through these so-called network effects, the carriers whose contributions fund the temporary reserve will benefit from the use to which that reserve will be put. *See* Mark A. Lemley & David McGowan, *Legal Implications of Network Economic Effects*, 86 CALIF. L. REV. 479, 551 (1998) ("The Internet, like the telephone network, exhibits a very strong form of network effect—the network is the product in a very real sense"); *cf.* William H. Page & John E. Lopatka, *Network Externalities*, *in* ENCYCLOPEDIA OF LAW AND ECONOMICS: THE HISTORY AND METHODOLOGY OF LAW AND ECONOMICS 952, 954 (Boudewijn Bouckaert & Gerrit De Geest eds., 2000) ("Producers of network goods may also receive increasing returns to scale in production"). That the final disbursement plan was not yet in place when the contributions were collected is beside the point; the Commission collected these contributions to support the expansion of universal service and no other use was ever contemplated. Moreover, the Commission gave itself only 18 months to establish the mechanism by which it would disburse the funds, belying the RCA's concern the funds might be put to some use other than the expansion of universal service.

Nor is the Act as interpreted by the Commission an unconstitutional delegation of the Congress's authority under the Taxing Clause to "lay and collect Taxes" because the assessment of contributions from carriers is not a tax. Although the RCA correctly points out the "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to recover administrative costs not inuring directly to the benefit of regulated parties by imposing additional financial burdens ... on those parties," *Skinner*, 490 U.S. at 224, here there was no failure of inurement. As we have explained, the carriers' contributions to the temporary reserve support a program to subsidize broadband Internet access from which those carriers will particularly benefit. The Commission is therefore imposing not a tax but a "fee" that "bestows a benefit on the [payor], not shared by other members of society," *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 340–41 (1974). *See TOPUC*, 183 F.3d at 427 n.52 (finding "no basis" for claim universal service support contributions violates the Taxing Clause because "it is payment in support of a service (managing and regulating the public telecommunications network) that confers special benefits on the [payors]"). In any event, contrary to the RCA's suggestion, "the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that ... applied to other nondelegation challenges." *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 223 (1989); *see also Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001) ("when Congress confers decisionmaking authority upon agencies Congress [need only] lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform" (internal quotation marks, citation, and emphasis omitted)). Because section 254 of the Act clearly provides an intelligible principle to guide the Commission's efforts, viz., "to preserve

and advance universal service," whether the assessment is deemed a tax is of no real moment.

In sum, as interpreted by the Commission the Act neither "raises Revenue" within the meaning of the Origination Clause nor delegates the Congress's authority to "lay and collect Taxes" in contravention of the Taxing Clause. Accordingly, the canon of constitutional avoidance gives us no reason to reject the Commission's interpretation of the Act.

b. Statutory Arguments

The RCA argues *Relinquishing ETC Status* violates section 254 of the Act for two related reasons. First, it argues the *Order* assesses contributions to be used for a purpose not previously designated by the Commission as a "service that is supported." *See* 47 U.S.C. § 254(a)(2) ("The rules ... shall include a definition of the services that are supported by Federal universal service support mechanisms"); *see also* 47 C.F.R. § 54.101(a) (designating services as elements of universal service eligible for support). Second, it argues the temporary reserve is not authorized by the "mandate [in § 254(d)] that the FCC assess contributions only for 'specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service.'" Both arguments ultimately turn upon the question whether there are temporal requirements implicit in the statute: Must the Commission amend the list of "services that are supported" prior to collecting contributions ultimately to be used to fund such a service? Similarly, must the agency "establish[]" a universal service support mechanism prior to collecting contributions intended to fund that mechanism?

The Commission's interpretation, under which it may collect contributions to support a program prior to that program either having been listed as a "service that is supported" or having been "established by the Commission," is a permissible interpretation of an ambiguous statute. The adjectival phrase "established by the Commission," although derived from a past tense verbial phrase, need not itself indicate the past tense. For example, in *Regions Hospital v. Shalala*, the Supreme Court explained the adjectival phrase "recognized as reasonable" modifying the word "costs" might refer to "costs the Secretary (1) *has* recognized as reasonable ... [or to costs the Secretary] (2) *will* recognize as reasonable." 522 U.S. 448, 458 (1998). Therefore, under *Chevron*, either interpretation was permissible. *Id.* at 464; *see also Dep't of Treasury v. FLRA*, 960 F.2d 1068, 1072 (D.C. Cir. 1992) ("'adversely affected' is simply an adjectival phrase, not a verbial phrase indicating the past tense, and hence allows alternative temporal readings"). So, here, the adjectival phrases — "services that are supported" and "established by the Commission" — are temporally ambiguous, such that the agency's reading them to encompass both the present and the future is reasonable. In *Relinquishing ETC Status*, the Commission directed the USAC to collect contributions from telecommunications carriers to be used for a "mechanism" to be "established" by the agency in order to subsidize a "service" the agency would thereafter list as "supported." In deferring to the Commission's interpretation that the Act does not require it to list a service and to establish the mechanism for its support prior to collecting funds for that purpose, we do not grant to the agency a *carte blanche* to collect contributions that it "may, someday" use: Because the Commission waived rule 54.709(b), which would have required the USAC promptly to reduce carriers' contributions, for only 18 months, *Corr Wireless Order*, 25 FCC Rcd. at 12,863; *Order*, 25 FCC Rcd. at 18,147 n.8, we have no

occasion to consider whether the Commission could have generated a "temporary" reserve for any longer or for any less well-defined purpose than the support of a specifically named service. Accordingly, we hold *Relinquishing ETC Status* did not violate the Act by collecting contributions for a limited time to fund a mechanism not yet "established" in order to subsidize a specific "service to be supported" but not yet listed as such.

### c. Regulatory Arguments

Finally, the RCA claims *Relinquishing ETC Status* violates the Commission's regulation that directs the USAC to set the quarterly contribution factor based upon "the ratio of total projected quarterly expenses of the universal service support mechanisms to the total projected collected ... revenues." 47 C.F.R. § 54.709(a)(2). The regulation includes "projections of demand and [of] administrative expenses" as elements of the "projected expenses." *Id.* § 54.709(a)(3). In *Relinquishing ETC Status* the Commission directed the USAC to "continue to project [CETC] demand at the full amount of the cap as established by the *Interim Cap Order*, without reflecting any adjustments to the cap due to relinquishment or revocation of ETC status by a [CETC]." 25 FCC Rcd. at 18,148 n.15. The RCA argues this directive "effectively treats the pool of 'relinquish[ed]' funds as an additional (non-enumerated) expense" in violation of rule 54.709(a) because the funds for the temporary reserve reflect neither actual demand nor an administrative expense for that quarter.

The Commission says the directive comes within its reservation of "the right to set projections of demand and administrative expenses at amounts [it] determines will serve the public interest" so long as it does so within 14 days of the USAC's release of its projections. 47 C.F.R. § 54.709(a)(3).

The RCA responds that the "authority to alter 'projections of demand' ... can only reasonably refer to the estimated demand for the four established universal service programs," of which the temporary reserve was not one. Nor, it argues, does *Relinquishing ETC Status* comport with the procedural form of the exception, which by its terms authorizes the Commission to supplant the USAC's projections only after their public release.

The Commission's interpretation of its own regulations is due deference under *Auer v. Robbins*, 519 U.S. 452, 461 (1997); we will accept it "unless the interpretation is plainly erroneous or inconsistent with the regulations or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question," *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2261 (2011) (internal quotation marks, citations, and alteration omitted). Here the Commission interpreted the term "demand" in section 54.709(a)(3) to include the demand for funds to be used in later quarters by a program to be established for the support of universal access to broadband Internet service. *See* 25 FCC Rcd. at 18,148 ("[T]he excess funds from the legacy high-cost program [could] be used more effectively to advance universal service broadband initiatives, as recommended by the National Broadband Plan"). There is nothing in the text of the regulation limiting "demand" to projected disbursements for the next quarter only or excluding from "demand" a program the Commission has announced its intention to establish. Therefore, the Commission's considered reading of "demand" to include disbursements it anticipates making in subsequent quarters is not "plainly erroneous or inconsistent with the regulation[]," *Talk Am.*, 131 S. Ct. at 2261, and accordingly we sustain it.

Nor is *Relinquishing ETC Status* defective as a matter of form. The *Order* does not retroactively change projections of demand for a prior quarter after expiration of the 14-day period for supplanting the USAC's projections. Rather, by its terms the *Order* is prospective: The "USAC shall continue to project [CETC] demand at the full amount of the cap as established by the *Interim Cap Order*." 25 FCC Rcd. at 18,148 n.15. The *Order* merely announces the Commission's policy regarding how it will revise projections of demand in the future. Accordingly, the *Order* does not violate the procedural requirements of the exception in section 54.709(a)(3).

In sum, the Commission's interpretation of the Act raises no significant constitutional concern, is a reasonable interpretation of an ambiguous statutory text, and is consistent with the Commission's regulations. Therefore, we hold the Commission acted within its statutory and regulatory authority in issuing *Relinquishing ETC Status*.

## B. "Sufficient" Support for Universal Service

Next, the RCA challenges the *Order* as arbitrary and capricious on the ground the Commission "makes no effort to explain whether or how the reduced pool of funds will be adequate to preserve and advance universal service." An order of the Commission is arbitrary and capricious and thereby violates the Administrative Procedure Act if it does not "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). We must set aside an agency's action "if [it] has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

The RCA argues *Relinquishing ETC Status* offers only "conclusory" statements in lieu of a reasoned explanation how the "reduced" cap ensures the "sufficient" support required by section 254(d) of the Act. That is not quite correct. Insofar as the *Order* leaves undisturbed the level of support going to each CETC pursuant to the *Interim Cap Order*, the Commission need not have explained again why that level of support is sufficient; we already had held in *Rural Cellular I* that its earlier explanation was adequate. 588 F.3d at 1102-1104. The RCA correctly points out that, although *Relinquishing ETC Status* does not reduce the amount of support any one CETC receives when another CETC relinquishes its status as an ETC, the *Order* does reduce the total support going to carriers in the relevant state by the amount the relinquishing carrier had received. This goes beyond the *Interim Cap Order* and therefore requires further explanation of how the program nonetheless provides support "sufficient" to "preserve and advance universal service" for residents of that state. *See id.*, 588 F.3d at 1103 ("The pertinent question is whether the interim cap will undercut adequate telephone services for customers, since '[t]he purpose of universal service is to benefit the customer, not the carrier'" (citation omitted)).

The Commission adequately explained this effect of the *Order* when it made clear it did not want simply to redistribute support from a relinquishing carrier to the remaining CETCs in the state: Such a redistribution "would not necessarily result in future deployment of expanded voice

service, much less broadband service" because it "could simply subsidize duplicative voice service." *Relinquishing ETC Status*, 25 FCC Rcd. at 18,148. The Commission previously recognized that "rather than providing a complete substitute for traditional wireline service, these wireless [CETCs] largely provide mobile wireless telephony service in addition to a customer's existing wireline service." *Interim Cap Order*, 23 FCC Rcd. at 8843. Moreover, "redistributing the excess funding to other [CETCs] in the state," *Relinquishing ETC Status*, 25 FCC Rcd. at 18,148, would only compound the problem because, prior to the *Order*, if a CETC relinquished its status, then the support it received would have been redistributed to other CETCs in the state, raising the subsidy they received without their having added a single subscriber line. In *Relinquishing ETC Status* the Commission explained its preference for, rather than bestowing such a windfall upon CETCs, husbanding those funds in order to subsidize broadband Internet service. *See id.* ("[T]he public interest would be better served ... reclaim[ing] such support rather than redistributing it, particularly as we proceed with broader reforms to transition to a universal service system that promotes broadband more directly"). Moreover, like the interim cap rule itself, this temporary measure was an "interim regulation[]" for which the Commission "should be given 'substantial deference,'" *Rural Cellular I*, 588 F.3d at 1105 (citation omitted). And "we have repeatedly held that '[a]voidance of market disruption pending broader reforms is ... a standard and accepted justification for a temporary rule.'" *Id.* at 1106 (quoting *Competitive Telcomms. Ass'n v. FCC*, 309 F.3d 8, 14 (D.C. Cir. 2002)).

Finally, the Commission provided a safety valve to ensure no CETC would receive a level of support insufficient to provide telephone service to consumers in high-cost areas. A CETC is "not ... subject to the interim cap to the extent that it files cost data demonstrating that its costs meet the support threshold in the same manner as the incumbent LEC." *Interim Cap Order*, 23 FCC Rcd. at 8848. Accordingly, if a CETC's costs increase because it adds subscriber lines, perhaps extending service to a previously unserved rural area or filling in where a relinquishing CETC has withdrawn, then it may receive a greater subsidy. This exception ensures no consumer will be denied telephone service because of the interim cap, as modified by *Relinquishing ETC Status*. Although the *Order* does not mention this safety valve, it had been created, as the Commission points out, in the 2008 *Interim Cap Order*, and was therefore part of the regulatory background against which the Commission promulgated the *Order* in 2010. 23 FCC Rcd. at 8848; *see also Rural Cellular I*, 588 F.3d at 1104 (explaining because of the "exception to the cap ... [t]here is no reason to believe ... support under the cap will be insufficient"); *Bechtel v. FCC*, 10 F.3d 875, 878 (D.C. Cir. 1993) (Commission "need not repeat itself" needlessly). *Relinquishing ETC Status* did nothing to change or to undermine the continuing validity of the Commission's rationale.

Accordingly, we hold the *Order* adequately explained how the interim cap on universal service support, as modified when a CETC relinquishes its status, ensures continued provision of the "sufficient" support required by section 254(d). *Relinquishing ETC Status* was therefore neither arbitrary nor capricious.

### III. Conclusion

For the foregoing reasons, we hold *Relinquishing ETC Status* was a lawful exercise of the Commission's authority under the Act, did not violate the agency's regulations, and was neither arbitrary and capricious nor unconstitutional. The RCA's petition for review is therefore

*Denied.*